I see that the only relevant things are the sentence itself, maybe in the context of the settlement agreement, just if the sentence alone doesn't direct you fairly unequivocally, then the settlement agreement, the sentence alone doesn't do, it doesn't, it's difficult, it certainly needs interpretation. I agree with you on that. In which case, I think, under basic contract principles, you look at the entire agreement. I think you need to look at the amendments to the agreement. So now, so when you do that, I mean, your argument essentially is that the causation factors must be diagnosed by an echocardiogram performed between the commencement of the diet drug use and the end of the screening period, which I guess is somewhere at the beginning of 03, January 3rd of 03. That is my position, precisely. The problem that I have is that when you look at certain things, when you look at this as a whole, the language you're looking to is on page 75A of the appendix. That's correct. And that's when you're saying that diet drug recipients who adjusted, who I call FedFed for 61 or more days, who were diagnosed by a qualified physician as FDA positive by an echocardiogram performed between the commencement of diet drug use and the end of the screening period, comma, with any of the following conditions, and one of the conditions is mitoannular calcification. Correct. But then you go just beyond that on 77A, two pages later, you look at C and you look at F. C says FDA positive regurgitation performed by an echocardiogram prior to the use of the diet drugs, and F is a history of daily use of certain drugs for a continuous period of longer than 120 days. Yes, sir. Those don't necessarily, the first one doesn't fit within the time you use diet drugs to the time, and the second one as well, so it looks like it's difficult to read this provision on 75A the way you're reading it. Your Honor, the two things that you talked about, the methasergide use, that is a drug that's known to cause this exact condition, methasergide, for the use of more than six months. That's why it's in there, because if you took that before you took the drugs, you would automatically have a confounding factor. There would be no way to prove it. That's why they have that for before the use of the diet drug. Are you saying the conditions revealed by the later cardiogram, echocardiogram, when that later, let's say the first one is 2006, and then under the Seventh Amendment, you'd be filing another green form in 2010 when this occurred. Are you saying that any conditions such as that revealed in the later echocardiogram are totally irrelevant? Yes, ma'am. If you look at the green form, the green form is to be submitted both for the original claim and relevant to the supplemental claim, correct? Yes. It asks specifically, on 187 under 9, it asks specifically about these conditions. Wouldn't you anticipate that if, for the later condition, this type of causation, or the later submission of this condition were irrelevant, that there would be a different form or something that says, oh, but only for supplemental? I'm just trying to make sense of all this. I agree. And I completely agree with you that if you had to prove the absence of alternative causation factors 10 years down the road, there would be a form for that. There would be questions saying, does the person have nitrile or calcification? This asks that. This asks, even for the follow-up form, you'd have to fill in these causative factors. I mean, I'm just wondering, from a common sense standpoint, why causation related to the later worsening of the condition is somehow irrelevant, just from a common sense standpoint. It's because, Your Honor, age, this MAC, as you've called it, is clearly related to age. There's no question about that. When you do it in 70, your claim is reduced by half. OK. And then you travel 70. So this is true. But if your condition worsens, and it's because of MAC, and because of your age, why should you get more money? Your Honor, because this is like a true insurance policy. The class counsel called it that, so did Wyeth. If you have an insurance policy, you fill it out. And you say, if I have MAC, how do I pay? You fill those things out. And then the insurance company takes the risk. Well, but here you're talking about the ability to get more money because the drug has caused a condition that has worsened. So from a common sense standpoint, if the condition has worsened by virtue of MAC, why should you get more money? Because the leakage is what causes the MAC. And that's uncontroverted in our record at page 2662. When you have longstanding regurgitation, it leads to mitral annular calcification, just like when you get older it does. It's clear as a bell, Your Honor, 2662. So what is there in the record that explains that that is a good reason why these conditions that appear later on are not relevant? All you have is a comma, and you're even explaining your way around the comma. We have much more than a comma, Your Honor. The green form, page 195A, has the sentence written the correct way. I'll give you a minute. Because you're obviously concerned, and you shouldn't be, because it would be a green form. I have 195A. 195A. This same sentence. This is what the doctor declared earlier. We're at the top. The second bullet point. Diet drug recipients who ingested. Diet drug recipients who ingested undiluted organox, as you say, for 61 more days. That's clearly her. Who were diagnosed as FDA positive within the following conditions. And it says MAC. That entire sentence is written in the past tense. There's nothing. There's no comma. The comma that Judge Barham found apparently dispositive does not exist there. And when you say FDA positive with MAC, that's a condition, just like sore throat with a runny nose, pneumonia with cough. FDA positive is a medical diagnosis that everyone has agreed on. The Food and Drug Administration, the lawyers, the courts, everybody. When you say FDA positive with MAC, there's no way to read that as saying with MAC it may develop 10 or 11 years later. That's part of the agreement. The definition of reliable medical guardian agreement. The basic idea here is, just like the insurance policy, you go off. Are you fit? You make an incredibly important decision at that point. You get with your lawyer and you say, I'm getting a bunch of damages. I'm getting my right to a jury trial. What am I going to do here, lawyer? And that lawyer said, you're getting these things up, but you're on a grid. You are fixed. You're set. Just like the insurance company who makes a decision on you. Once you get in, if you develop high blood pressure or disease, you're covered. That's how it works. And they touted this. As an insurance policy, it widely coached the lawyer to say it. But there still has to be a causative relationship. Between the drug and the worsening condition. Just like in the Barnhart case where they were talking about administration by proxy and disability by proxy. Instead of going through an individual case and saying, in this case, did her MAC develop as a result of long-standing regurgitation? Did it result of old age? Or did it result of the ongoing cause of the diagram? Those things are causation questions that would be impossible to address. So in a class action involving 6 million people, you do it by proxy. Just like the Social Security Administration does disability by proxy. Are you saying that causation really became irrelevant after diagnosis of FDA-positive during the screening period, and then anything that may have developed later is not relevant? That's essentially what I'm saying, and that's what Judge Barber said in footnote 3. It's incredibly important that we get this. Because Judge Barber, in footnote 3, said specifically, in his reading in 2, reading in .2, footnote 3, he says these are factors that would make it difficult to prove that their VHD was caused by the use of diagrams. VHD, you have to prove a whole lot of things to get on with this. If you did not have the MAC during the screening period, the echocardiogram that was performed during the screening period, that would lead you to believe that the event then was the cause of the VHD. That's exactly the whole idea, Your Honor. And in this case, this person already, because you've got FDA-positive, you're now in, you're in the matrix. You've proven that you've got this, and if you exclude the causation factors at that point, they have agreed that in the future, if you have FDA-positive within any of these conditions, which is what it says in the rank form, then you're in, just like me, and then we made the intelligent decisions to give up punitive damages and jury trials, and then we did it on the basis of a sentence that can't be read, that can't be interpreted, and we're in, and we should let us see the rest of the agreement and see what Class Counsel and Wyeth said about this. Well, the problem at 185, there's a specific statement that if you qualify initially, or if you barred, I guess, initially, shall not be disqualified from receiving the agency if a subsequent emperor cardiogram shows that the required levels are no longer present. In other words, a condition that was present initially then disappears, you're fine. Don't you think the follow-on that counsel should have inserted in there is an, oh, by the way, if you have a disqualifying condition, and your condition worsens, then these things that apply initially will not bar you. Shouldn't that have been there? Shouldn't something clearly have been said other than relying upon, oh, well, this antecedent doesn't work? Your Honor, if you have entered into a class action that says, if your condition is removed due to exercise or due to some other drug, your condition is removed, you still get paid. Who in the world is going to think if your condition worsens, you don't get paid? That is absurd. If your condition worsens and it's based upon, and the other factors are there such that perhaps it's not the drug. If your condition, what we have is a condition that is caused by chronic blood leakage. But what we have here is that the auditing cardiologist for the trust said that it appeared that the echocardiogram done in 2002 determined that there was some problems. Right. And in 07, I think, to 09, about two and a half year period, maybe 07, October 09, it was clear on the echocardiograms that it was there. Right. So if you make a decision that she's not covered, isn't that supported, though, by that auditing cardiologist? Absolutely. And our specific request to you, Howard, is that we get the chance to argue about that finding in Dr. McCullough where she found that. That's all we ask for. That's all someone calls for. But then I come back to it, but that's where I started. If you have alternative causation factors that are not countable, and the alternative causation factors you say have to be fit within a certain time period, the time you start taking drugs to the end of the screening period, and as I go to you, there are two causation factors that I just know of that cannot fit within that time period, that seems to be game-setting math. Those are not, Your Honor, those are pre-existing factors that, by definition, if you take this certain drug, methaserginide, for six months, they're not going to give you any of the steel if you have FDA-positive. They're simply saying, you know what, I'll give you a little bit of money. When I first looked at the patient, at least whoever did it was excellent, but I thought, okay, there's a real issue here. But the more and more I dig, I don't think there is. Your Honor, if you, I'm going to... We'll cut everybody in order to tell us the difference. Can you tell me again that exact sentence? Because I know it's a separate section of the game for me. I'm looking, just to get back up on page, when you look at C, okay, 75A, and then you look at, so C goes little i, two little i's, and the two little i's of the D is FMAC, and three little i's, and the three little i's, C and F. So they all fit within the general C. And the general C gives you a specific time period, and yet F and C, under three little i's, are clearly outside that time period. So I'm not sure I can read C the way you want me to read C. But I don't think I can. If you're bound by the settlement agreement, there's something that goes on during the screening period that that clause, which is probably used, that's kind of set it off properly and properly, but when it says who were diagnosed as FDA positive during the screening period, that clause, for it to make any sense, Your Honor, you've got to have something going on during the screening period. And the way that the whole settlement is set up is you make your decision at that point, do I want to get into this or not? So if I had taken that decision, I would have looked at that very carefully and thought about that. If you have micro-annular calcification at the time of the screening period, you have to think very carefully about that. Do we need information about the science here? I mean, there's nothing in the record that says... Well, we'll hear from you, Your Honor, Bob. Thank you. Thank you. Yes, Mr. Court. My name is Jules Hanshaw. I represent the AHP Settlement Trust. The district court, just like the trust, when it was presented with cases of this sort, interpreted the settlement agreement. And... Let me just ask a dumb question at the outset. What law applies to this? What's the law? Is it Pennsylvania or federal common law? I should have asked that question to Mr. Petrov. Pennsylvania law. Okay. This court has applied a de novo standard of review to district court analyses that interpret settlement agreements. Without any facts outside the record, if you will. That's correct. And I don't believe that facts outside the record are necessary. The district court analyzed the settlement agreement and interpreted it as providing no general limitation on the presence of much higher recalculation. What is the importance of the screening period? The screening period was a period of time during which, if you look at the provisions relating to the screening period, they can be found at settlement agreement section 4A, pages 58 through 62 of the appendix in this matter. The screening period was a time for determination of whether or not persons had FDA-positive, with a lower regurgitation, or at least mild, much lower regurgitation. And those were conditions that triggered eligibility for certain more or less benefits. Those conditions also established eligibility for matrix-level conditions. Because the matrix claimant must first determine that they were eligible by the end of the screening period. And eligibility was whether they had FDA-positive regurgitation or at least mild, much regurgitation. If you look at the screening period provisions, there's nothing contained in those provisions of the settlement agreement that established the deadline that Mr. Petroff says existed for the determination of whether or not, but if you didn't have confirmation of FDA-positive regurgitation during the screening period, you can't be a claimant. You can't claim it for matrix compensation. What in the agreement indicates that when you're considering a worsening condition, or a worsening condition, that the conditions that would put you in a different matrix at the outset would necessarily apply at the worsening stage, at the supplemental 7th Amendment stage? What is it that we can say, ah, of course, when it's worsened, you still look at the, quote-unquote, pre-existing conditions? I think if the court looks at the provisions that, first of all, relates to when matrix A, which is the matrix that Ms. Hagelin would like to be on and have her claim determined by. Matrix A is determined by section 4D2D1. All right, where are we in the appendix? 74. And it describes class members and settlement compensation on matrix A. It contains no requirement that conditions such as a mutual annual justification be determined prior to the close of the screening period. When the 7th Amendment was adopted, well, originally the 7th Amendment was not anticipated, correct? Originally. So the settlement agreement was as if, here's your one shot. Correct. Here's your shot at getting benefits. And then when there's so many claims... No, I don't disagree. The fact of the matter is that under the original term, the terms of the original settlement, claimants could submit multiple claims for matrix compensation. They didn't have one shot. Didn't they have to, in order to qualify for matrix benefits, have an FDA-positive diagnosis of FDA-positive regurgitation within the screening period? In order to be eligible, that is correct. In terms of eligibility, they had to have an echocardiogram performed between ingestion of diadrugs and the close of the screening period. They didn't have to rely upon the screening echo provided by the trust. They could get their own private echo to establish that eligibility. And as many times as they wanted to go get an echo, they could seek to qualify. Okay. So you're saying that by virtue of D1, which would apply to any form that's submitted, correct? Correct. Okay, because it says whose conditions are eligible but do not have any condition or circumstance, which makes B1 applicable. Anything else you can point to that would help us? Certainly not. Okay. As I pointed out in my brief, the employees wanted to or intended to place a temporal limitation on the conditions, such as MAC, that require a determination or claim on matrix B. They knew how to place it. They knew how to do so. They did so with respect to aortic sclerosis. If you look at pages 76 through 77A, that's 77 on the appendix, you will see conditions such as aortic sclerosis where the parties, the directors to the settlement agreement, require that claim to be placed on matrix B  as of the time they are first diagnosed as FDA-positive. That language, as of the time they're first diagnosed as FDA-positive, would be absolutely unnecessary if Plankton's interpretation of Section 4B2B2 were to prevail. And Javier also pointed out the fact that there are conditions that simply don't fit into that interpretation. There are conditions that precede diagnostic injections such as prior heart valve surgery, bacterial endocarditis, or prior regurgitation. The alternative factors, what do they cause? Do they cause severity-level conditions to deteriorate or just FDA-positive regurgitation of both? They could cause bone regression in the claim as well as the initial demonstration of the regurgitation to be eligible. Thank you, sir. No further questions. The other thing I would like to close the session is to the rule form that you looked at previously at 186 and 187 of the appendix. At rule form part 2, sections D and E are listed as the conditions which require an end on matrix B. And they don't have a time limit on them? No, in fact, the instructions to assessing physicians at the heading of section D expressly contemplates more than just an echo. It expressly contemplates that, and especially in cases such as this where surgery is involved, that there would be more intensive documentation that there could be a cardiac catheterization report. And certainly, as required in the terms of the settlement agreement, there would be documentation of the surgery itself. And so then the heading of section D, of which D9 is much-milder calcification, the instructions tell assessing physicians that they base their determination as to the presence of much-milder calcification not only on the echo that establishes eligibility, but they can base that on a cardiac catheterization or surgical examination. And in this case, there's no dispute that there's a transesophageal echocardiogram performed during the surgery, which clearly demonstrated much-milder calcification. That heading would have absolutely no purpose or instruction to an assessing physician is the interpretation that is properly here by the homework for them. What about your colleague's argument that once you get in, if you have been determined to have no preexisting conditions so that you're in and you're entitled to benefits, if you then get worse, why should the idea that what you've already shown, if you will, that it's the drug that has caused your condition, why is it relevant later on? Because there's a presumption, let's say, that the drug has caused it because you basically got in the door at the higher level. Why does that not make sense? It doesn't make sense, given the fact that this settlement was constructed to create empirical objective criteria without regarding causation except whether there was a specific requirement, such as a death claim. Aside from that, the settlement was constructed so, and knowing that, yes, mitral angular calcification, aortic stenosis, conditions of that sort, may well appear as a function of age, but they don't appear in everyone, as not every older person suffers from mitral angular calcification. And so the conditions that we're talking about here may intervene at any point prior to a major matrix event or matrix condition. So without regard to causation, that claim still has value, but it has a reduced value if one of those reduction factors are present. But can VHD lead to mitral angular calcification? I'm not a physician. Okay. Inquiry. I just want to know. I have no further questions. Very quickly, because Mr. Petroff relies upon terms of the South in the 7th Amendment, I'd like to direct the Court's attention to the fact that the 7th Amendment really doesn't support Ms. Hamerman's contention that the only place an independent auditing cardiologist could trust or the district court could look was her Category 1 echocardiogram. The terms relied upon in relevant echocardiograms, alternative causation factor, those are 7th Amendment terms, and if you look at the definitions of those 7th Amendment terms, they relate to Ms. Hamerman's Category 1 claim. She opted into Category 1s when there was 40,000 claims that might not be decided for many years. She did so with rules that provided Category 1 claims. You know, you make your Category 1 claim, you have one echocardiogram to share, provide it, and they funded it an additional $1.27 billion. But you had to select your echo. It wasn't like the trust where you could submit matrix claim after matrix claim on the basis of a variety of echoes. And if you look at the definition of relevant echocardiogram in 1D59 of the 7th Amendment appendix page, it's 234-235 of the appendix. The relevant echocardiogram references conditions that are only relevant to a Category 1 claim. It talks about high and low threshold conditions. I submitted that there is no reference to a supplemental high-level claim in the definition of a relevant echocardiogram that is reliant on echo. And likewise, alternative causation factor, which is at 220-222A, Section 1B3, this applies only to claims seeking benefits subject to medical review. And the claims subject to medical review are the claims in the 7th Amendment to Category 1 claims, not the supplemental claim that was submitted to the trust. So to the extent that those terms would support relating back to a single echocardiogram, they're simply going to have to fall to the supplemental one. The 7th Amendment avoided Category 1 test numbers without being able to pursue a supplemental claim in the trust. But that supplemental claim had to meet all the requirements that existed prior to the 7th Amendment, as well as high matrix-level qualifying factors identified as the 7th Amendment. And there simply is no reference to a relevant echocardiogram in the definition of high matrix-level qualifying factors, and it certainly doesn't appear anywhere in the original 7th Amendment. I submit that the 7th Amendment and the 7th Amendment provide ample indicia that the District Court did not err in its interpretation, consistent with the account and intent of the parties. Accordingly, this Court shall affirm. Thank you. Thank you. Mr. Pickles? Your Honor, I've looked at that section that you talked about, the section having to do with specific nitrile valve prolapse, echocardiograms, the metasterogy. Those are a separate section. They're both analogous to it. It is what I'm looking at, Your Honor. No, I'm talking about thrombolysis. Where? 77? 77. 77 and 76. 76 is D. Thrombolysis D is back. Three of the Ys is under C and F. I just said that they cannot fit within the time frame you're talking about. That's because those are dealing with drugs that are ingested, or echocardiograms specifically that were done before the one at issue. That's what that is specifically talking about, Your Honor. But they're all under C, which is the one using the controllers. I didn't write it. I can tell you. That's why we're here. Who did write this? Class Counsel and Wyeth. They took seven months to work on it, according to the testimony in the record. This is not a regular agreement. Keep in mind, class action involves notice, opportunity to be heard, depositions, live cross-examination of everyone that we know involved in the negotiations. Sam Chesley, co-lead counsel, said in similar words, Matrix D is for people with serious causation problems. Serious causation problems was his testimony. This is incredibly important. 3286 in the appendix, he testified to that. He says Matrix D is for people who have problems that they can't get into the deal with. And that's what he says at 3285A. He calls them pre-existing conditions at 3285A. These are incredibly important terms when you're dealing with 6 million people who've had 365 days to decide whether they should give up punitive damages or a right to a jury trial. I think it's reasonable to rely upon open court testimony where this was all discussed and where there were constant references to stemming up a procedure, doing more, making a claim for future benefits, future progression, future rights, not future punishments. Your brief, unfortunately, points us so much in the direction of the comma and the antecedent and the reading of one passage that, quite frankly, a lot of the things that we've inquired about today just aren't really brought up. And I'm wondering why, you know, serious causation problems, why with a worsening condition could there not be similarly serious causation problems, i.e., the person got older. There aren't. And if you look at the matrix, when you turn 70, your claim is cut in half. They're already hacking away. Because of age, not because of any drug. But if they wanted to address this, they would have had procedures. They had this for 13 years. They would have had procedures where we'd be able to come in and say, in this case, we think that the MAC 13 years out is caused by progression of the disease. Just like Dr. Matreja said on 2662 in his declaration. This is a known complication of valvular heart disease. You ask that question, the answer is 2662A in the appendix. The answer is this happens. You get older, and especially if you have a condition related to the diet drugs, it will progress. They know that. They bought. They agreed to this. They made an offer. They said, 6 million people, give up your rights and come on in. Nowhere did they ever indicate that in words or in a testimony. Go around it. Never did they say we could step down and issue benefits. Age cuts you in half when you're 70, Your Honor. I don't know why we want to do this. Well, in terms of getting additional monies, that's the point. Getting additional money. You get money up front. But later on, you either do or do not get more. Right. But it's cut in half. Age is already taken care of. There's no analysis, no procedure to try to, there's no form to fill out saying, Is there a lack of surgery? Echo. We admit she had it. Let's be clear on that. I have to just explain. Just one last, your time is up. If you'll just conclude, please. In the appendix, there's two references to the end of the screening period being critical in evaluating a surgery claim. Page 226A, its definition of high-level matrix qualifying factor, requires that it's in during the screening period. And then page 234A, relevant echo that they relied on says the single echocardiogram. Now, what is that single echocardiogram if it's not the qualifying one? Thank you. Thank you, Your Honor. Thank you. The case is well argued. Take it under investigation.